SISTENT WITH THIS OPINION; COSTS TO BE PAID
BY APPELLEE.

667 A.2d 931

**In re BARRY E., Clementyne E., Kristyne E. and Miriam E.**

**Nos. 1868, Sept. Term., 1994, 381, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Nov. 29, 1995.

Nancy S. Forster, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Donna R. Heller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before WILNER, C.J., HOLLANDER, J., and JOHN J. GARRITY, Judge (Retired) Specially Assigned.

WILNER, Chief Judge.

Appellant, the mother of four young children, appeals from certain orders of the Juvenile Division of the District Court

for Montgomery County respecting the custody of those children and her right of visitation with two of them. With one modification, we shall affirm the challenged orders.

## FACTUAL BACKGROUND

Court involvement with the family began in April, 1993, when the county Department of Social Services (DSS) filed petitions to have the children—Barry (age 7), Clementyne (age 6), and Kristyne and Miriam (twins, age 4)—declared children in need of assistance (CINA). The petition was based on allegations by appellant, confirmed through preliminary discussions with the children, that, on one occasion several months earlier, the father had sexually abused Clementyne, Kristyne, and Miriam by having them squeeze his penis as he lay naked in bed. The day the petition was filed, the court held a shelter care hearing, committed the children to DSS for placement with appellant, ordered the father not to have any contact with the children or the family home, and ordered psychological evaluations of the father and the children.

On May 19, 1993, at DSS's request, an emergency hearing was held, following reports that the father had violated the no-contact order by calling the house on one occasion and that appellant had threatened to burn down her house because of some disagreement with DSS regarding who was to conduct the psychological evaluations. As a result of the hearing, appellant was ordered to have a psychiatric evaluation, to meet with her psychiatrist weekly, and to take the medication prescribed by the psychiatrist. The commitment, placement, and no-contact provisions in the April order were retained.

The father continued to violate the no-contact order by calling the house on several occasions, as a result of which a petition was filed to hold him in contempt.

The next hearing was on October 14, 1993. It comprised an adjudicatory hearing on the CINA petition, a temporary disposition hearing, and a hearing on the contempt petition.

Between May and October, both parents and the children underwent psychiatric or psychological evaluation. The father, evaluated by Dr. David Fago, was found to be "very disturbed" and "unpredictable." Dr. Fago concluded that the female children had been molested on numerous occasions and that the father continued to present a danger to the children. Dr. Alan Brody, the psychiatrist who examined appellant and the four children, concurred that the three girls had been the subject of molestation on more than one occasion. In reports forwarded to the court in July, 1993, he concluded that appellant appeared to be suffering from "a schizophrenic like illness" that "clearly interferes with her effectiveness as a parent," that Barry had an "Adjustment Disorder with a Depressed Mood," and that the three girls were each suffering from a post traumatic stress disorder. There was evidence that the father continued to violate the no-contact restriction and that, on one occasion, he accompanied appellant and the children to a school carnival.

At the conclusion of the hearing, the court found the children to be in need of assistance, continued the commitment to DSS and their physical placement with appellant, ordered that appellant have no contact with the father and that the father have no contact with the children, directed appellant to continue in therapy, and ordered psychological evaluations of appellant and the children. The court also found the father in contempt and sentenced him to 18 months in the county detention center. None of these decisions are challenged in this appeal.

Four disposition hearings were subsequently held—on February 23 and 28, April 20, and August 5, 1994, followed by a review hearing on February 1, 1995.

Prior to the first hearing, appellant was evaluated by Dr. Silvia Petuchowski, a psychologist, who prepared an extensive report. That report, supplemented by Dr. Petuchowski's testimony, was presented at the February 23 hearing. She regarded appellant as having poor judgment and insight, noting that, on several occasions, appellant threatened to buy

a gun and "shoot everybody" if her children were removed. Responses to tests and the evaluation process revealed "the display of most maladaptive and primitive defenses, such as undoing, denial, projection, delusions of persecution, delusions of grandiosity, and auditory hallucinations." She copes with stress, the report said, not through systematic problem solving but by denial and absenting herself from the problem. In her report, Dr. Petuchowski opined that the children "are not currently adequately protected and guided" and did not "live in a world structured enough to allow adequate space for personal psychosocial development." She testified at the hearing that the children were not in immediate danger, so long as they were kept away from their father, but she seemed to imply that significant therapeutic intervention was required for appellant to be able to keep them safe and functioning.

No substantive decisions were made at the conclusion of the February 23 hearing, which was devoted solely to the testimony of Dr. Petuchowski and reception of the various reports.

When the hearing resumed on February 28, Andrew Bourke, a DSS case-worker, recounted some of the history of the case. He noted concern over the episode when, with appellant's apparent connivance, the father joined the children in the trip to the carnival. He said that appellant had lied to him about that event, telling him that the man accompanying them was not her husband, and that she had coached the children to express a similar denial. Subsequently, when he learned that the father had been released from detention in late January, he called appellant to notify her and to impress on her the need to enforce the no-contact order. She responded that the father had $1,000 in the bank and that, if he paid her $500, she would allow him to see the children. Bourke opined that appellant did not seem to understand the danger presented by the father.

Bourke testified that the children were at risk of further abuse by the father because appellant was unable to sustain the no-contact order and that there was no practical way DSS could monitor the situation in the home. Based, in part, on

Dr. Petuchowski's report, he recommended that the children be placed in foster care and that there be no visitation with appellant for the time being. With some ambivalence, Dr. Petuchowski, who had met with appellant after the last hearing, agreed. She said that "[t]he state of affairs as it is, is not conducive to a safe environment."

At the conclusion of the hearing, the court, crediting the testimony and reports of Dr. Petuchowski, found that the children would be in danger if left with appellant. It ordered that the commitment to DSS be continued but that the children be placed in foster care. It further ordered that there be no visitation with appellant until she submitted a report from her psychiatrist (who had earlier recommended that the children remain with appellant), and that appellant refrain from any contact with the court, Dr. Petuchowski, or Mr. Bourke.[1] That order, with one modification, was confirmed by the court on March 23, 1994.

On April 20, 1994, the court held a third disposition hearing.[2] Stephanie Kaczman, the social worker who had been dealing regularly with the children since December, testified to a considerable improvement in their manner and behavior and to their positive adjustment to foster care. She recommended the prompt beginning of supervised visitation with appellant, starting twice a month and increasing to weekly. Dr. George Saiger, appellant's treating psychiatrist, testified that appellant was on a new medication and had made progress. He felt that she could be reunited with the children right away—that appellant was able to deal with them and would not harm them. Following that hearing, the court entered an order providing for bi-weekly supervised visitation

---

1. There was some evidence that appellant had harassed Dr. Petuchowski and Mr. Bourke.

2. The docket entry for that hearing refers to it as a review hearing. As noted later in this Opinion, the next plenary hearing held by the court was on August 5, 1994, which the docket also refers to as a review hearing but which the court, in an amended order, stated was the final disposition hearing. Whether the April 20 hearing was technically a disposition hearing or a review hearing appears to us to be immaterial.

but otherwise confirming the February 28 order. Another hearing was scheduled for June 16, 1994.

The next actual hearing took place not on June 16, but on July 8, 1994. On July 1, however, the court, without notice to appellant or her attorney, or even to the attorney appointed for the children, met with the children in the courtroom. The only other people present were the foster mother and a DSS social worker. The meeting was recorded, although parts of the conversation were inaudible and the transcript does not clearly identify which of the children is talking at any particular time; each of the girls is identified only as Ms. E.

During the meeting, one of the girls—apparently Clementyne, although it is not clear—said she wanted to live with appellant. Another child—either Kristyne or Miriam—in response to questioning from the court and in the presence of the foster mother, replied that she wanted to live with the foster mother. This was followed by the question, "Do you like visiting with your mother," to which the child replied, "Kind of." We can find no indication from the other child of her feelings about visitation; her response to the question from the court, according to the transcript, was "unclear." The judge concluded that the twins "don't want to visit with their mother," although we can find nothing in the transcript to support that conclusion. After the children left the courtroom, the social worker told the court that the twins did not want to visit with appellant. This, of course, was not under oath and was not subject to cross-examination.

Appellant's attorney learned from the DSS attorney about the meeting and, at some point, entered the courtroom. She objected to the proceeding and to the fact that she had received no notice of it. The judge replied that she had not intended for anyone to be present except the social worker or the foster mother and the children. She regarded the proceeding as a chambers conference, from which the attorneys could and would be excluded. Counsel responded that she had no objection to being excluded from the courtroom so long as (1) she had notice of the proceeding, and (2) the proceeding

was recorded. The court seemed to acknowledge the validity of those two conditions.

At the hearing on July 8, Dr. Thomas Reynolds, a psychiatrist who had examined appellant at Dr. Sager's request, testified that she had a "schizotypal personality," which was treatable. He noted that her relationship with the father was over—apparently the two had been divorced—and that she was "quite able" to protect the children from their father. After listening to his testimony, the court adjourned the hearing until August 5, 1994.

At the resumed hearing, Dr. Reynolds was cross-examined, and Ms. Taliaferro, a DSS social worker, testified about the last two visits between appellant and the children, which did not go well. On the first of the visits, appellant got into an argument with one of the twins, Miriam, as a result of which all of the children became upset. On the second visit, two weeks later, the twins did not want to go at first. On the way home, Miriam refused to buckle her seat belt. Summarizing the various reports and evidence the court found relevant, it concluded that the children should remain in foster care with supervised visits at least once a week. Though not specified in any order entered by the court that we can find in the record and not mentioned in the docket entry, the transcript reveals that the court told the social worker to give the twins the "casual option" of refusing to go on the visits. As noted in footnote 2, *supra*, the court declared this to be the final disposition hearing. A review hearing was scheduled for February, 1995.

On January 18, 1995, the court again met with the children without any notice to appellant or her attorney and without formal notice to counsel for the children. It appears that the only persons invited to this conference were the children and the social worker, Ms. Taliaferro. The proceeding was not even noted on the docket. Once again, appellant's attorney happened, by chance, to be in the courthouse and did, at some point, enter the room. She said later that she could not hear the entire conversation, and, indeed, although the proceeding

was recorded, a good part of it is not reflected in the transcript.[3] It is not clear where the participants were in the room or whether the conversation between an individual child and the judge was audible to anyone else.

During that conversation, the judge asked the children whether they wanted to continue visiting with appellant and assured at least one of them that, if she and the other children did not wish to visit, it was all right and the judge would not require that they do so.[4] The judge also told the child that appellant's "mind doesn't think straight."

Just prior to the February 1 hearing, appellant moved that the judge recuse herself. The motion, though docketed, is not in the record extract. At the beginning of the February 1 hearing, counsel noted that the motion was based on the January 18 meeting with the children and counsel's perception that the judge was no longer able to be fair and impartial. Counsel for the children also complained that "if you are going to meet with the children, to the exclusion of everyone else, that my role as counsel for the children is somewhat superfluous...."

The judge denied the motion. In doing so, she indicated that she too was not aware that the conference was to take place—that it had apparently been arranged between the social worker and the judge's secretary and she assumed that everyone had received notice of it. She nonetheless defended

---

3. As was the case with the July 1, 1994 conference, many of the children's responses to the court's questions are not recorded—the transcript stating "No audible answer" or "unclear." The entire conversation with Barry, according to the transcript, was "not audible due to Courtroom noise by the other children present."

4. The judge did that on at least three occasions in her conversation with Clementyne. Whether the other children could hear her comments is unclear. On the first occasion, when Clementyne reported that "sometimes I don't go, and sometimes all four of us don't go," the judge responded, "that's okay." Later, responding to Clementyne's statement that "[w]e don't visit, and sometimes we really don't want to," the judge said, "Then that's fine, don't. I'm here to tell you, that's just fine." At the end of her conversation with Clementyne, the judge told the child once more, "if you don't want to visit, you don't have to visit."

the practice of meeting with the children privately, so long as the conference is recorded. In the end, she declared that she had no ill feelings about appellant and would act in the best interest of the children.

Having disposed of that motion, the court announced that it had a very limited amount of time. Counsel for appellant asked the court to hear from Dr. Saiger, appellant's psychiatrist, about the need for more meaningful visits to assist in reunification efforts. The court said that it did not need to hear from him, as (1) he had testified at the disposition hearing and it would be a "waste of time" to hear again that the children should be reunited with appellant immediately, and (2) as Dr. Saiger was not present at any of the visits that had occurred, he had no relevant information to impart regarding them. The court then heard from the DSS social worker, Ms. Taliaferro, and admitted her progress report on the children.

The progress report indicated that, since the August hearing, there had been 21 scheduled visits, all at local parks or fast food restaurants, that Barry had attended 19 of them, Clementyne had attended 17, and the twins had attended only 10. According to the foster mother, all of the children act out on the day of a scheduled visit, but the twins were the most vocal in refusing to see their mother. The social workers who attended the visits reported that appellant seemed too preoccupied with her own feelings and problems to pay attention to what the children say and that the children lose interest. They also noted that appellant seemed to favor Barry over the girls. All of the children were doing well in foster care and in their therapy. Ms. Taliaferro testified about one recent visit when appellant got into a loud argument with the counter person at a fast food restaurant, embarrassing the children.

Following direct examination of Ms. Taliaferro, counsel for appellant again asked the court to hear from Dr. Saiger, who could respond to the evidence presented by DSS and wanted to complain about a lack of cooperation by DSS. Once again the court refused on the grounds that it had no time and that

his testimony would simply be a repetition of what he had said at the disposition hearing and would therefore not be helpful. Any complaint about a lack of cooperation on the part of DSS could be addressed through a written motion. The court also rejected any notion of unsupervised visits. The court then found time to hear from another DSS worker, Ms. Whitehead, who also attended some of the visits. She expressed concern that, although appellant and the father were recently divorced, appellant still wished that she could have the father in the home. There was no corroboration of this concern.

At the conclusion of the hearing, the court recounted the evidence establishing the positive experience the children were having in foster care and the problems associated with their visits with appellant. It announced that it heard nothing to persuade it to change the order—to reunite appellant with the children or even to allow unsupervised visits—and decided to make no change. This appeal ensued, in which appellant makes four complaints:

(1) That the evidence was insufficient to support the commitment of the children to foster care;

(2) That the court erred in allowing the twins to have the "casual option" of declining to visit with appellant;

(3) That the judge should have recused herself on February 1, 1995; and

(4) That the court erred on February 18, 1995 in refusing to hear from Dr. Saiger or to allow a continuance to hear from him at a later time.

## DISCUSSION

We have given a detailed recitation of the underlying facts in order to provide a proper framework for considering appellant's complaints.

### Continuation in Foster Care

■ Appellant's first complaint is based on the assertion that she has done nothing to harm the children or to justify their removal from her care. Citing *In re Joseph G.*, 94

Md.App. 343, 617 A.2d 1086 (1993), she points out that the only abuser—the children's father—is out of the home and out of her life and that she has made efforts to obtain services for the children.

In *Joseph G.*, an infant was declared CINA on evidence that his mother had abused him by crushing his testicles shortly after birth, that his father had initially refused to believe that the mother had done such a thing, and that the father still had some contact with the mother, although the two were separated. Over a dissent, a majority of the appellate panel affirmed that determination. The panel nonetheless vacated that part of the judgment denying the father custody of the child, holding that the evidence did not suffice to support a conclusion that the father was an unfit parent or was unable to care for his son. Because a significant amount of time had elapsed since the CINA determination was made, this Court remanded the case for an evaluation of the current circumstances.

This case is different. It is true that the initial cause for the commitment to DSS was the allegation of abuse on the part of the father, who has since left the home. The removal of the children from appellant's home, however, came as the result of evidence (1) that she remained unwilling or unable to protect them from contact with the father, and (2) that she was unable to deal appropriately with them and the problems emanating from the abuse. The evidence presented at the various disposition and review hearings, though disputed in some respects, sufficed to show that both of those conditions continued to exist. Lurking throughout was the concern that, because of her own emotional problems, appellant could not be trusted to safeguard the children.

The reality and validity of that concern is a matter for the trial court to determine. Another reader of this record could, to be sure, get the feeling that DSS is now more concerned about the overall relationship between appellant and the children than with whether the father, much less appellant, still presents any legitimate danger. If that is, in fact, the case, it would be incumbent on the court to insist on

more meaningful efforts to reunite appellant and her children. The fact that appellant has a mental or emotional problem and is less than a perfect parent or that the children may be happier with their foster parents is not a legitimate reason to remove them from a natural parent competent to care for them in favor of a stranger. *See Montgomery County v. Sanders*, 38 Md.App. 406, 381 A.2d 1154 (1978). The trial court did not find that to be the case, however, and we cannot say that it abused its discretion or was clearly erroneous in determining that the children would still be in some danger if returned to appellant's unsupervised custody.

### Visitation

■ Appellant's second complaint has more merit. It is true, as DSS argues, that parental visitation is not an absolute right and that it must yield when inconsistent with the best interest of the children. It is not a privilege that may be easily denied, however.

■ The judge below adopted the view that she would never force a child to visit with his or her parent if the child decided not to go. Expressing that to the youngsters as she did, even when coupled with the suggestion that they ought to visit with their mother, was a clear, and most unfortunate, signal that it was all right for them to refuse, for any reason they chose. While that may have some practical validity with respect to older children, when dealing with five-year olds, such a strident view is misplaced. *See Leary v. Leary*, 97 Md.App. 26, 48, 627 A.2d 30 (1993) where, in the context of a custody case, we noted that, "[w]hen a child is of sufficient age and has the intelligence and discretion to exercise judgment as to his or her future welfare, based upon facts and not mere whims, those wishes are one factor that, within context, should be considered by the trial judge...."

■ The caveat we expressed in *Leary* applies as well to visitation decisions. It cannot be left up to the unfettered discretion of these five-year old children whether to visit with their mother, especially when the visits are carefully super-

vised. There is no indication in this record that the children were of sufficient age and had sufficient discretion to make that decision, or that their decision not to visit was based on fact and not mere whim or pretext.

If visits at a park or a restaurant seem to be a problem, some other site should be considered. More than 18 months have elapsed since the children were placed in foster care; in the six months preceding the last review, the twins missed more than half the scheduled visits simply because they chose not to go, and we were informed at oral argument that few, if any, visits have occurred since February. If that continues, not only will there be no realistic prospect of reunification, which, at least facially, still appears to be the stated goal of DSS, but any significant emotional bond between the children and their mother may be permanently lost.

We shall remand this aspect of the case for a *prompt* hearing to determine what efforts DSS, the various therapists, and appellant can cooperatively make to inaugurate regular visitation. We do not suggest that the children be physically forced, kicking and screaming, into their mother's presence but simply that the matter be given a higher priority than it appears to have received to date and that greater and more directed efforts be made to ease the children into such visits. On this record, there is no justification for the suggestion made by DSS that visitation should not be compelled until further therapy—of unspecified duration—is completed. The children have been in therapy for nearly two years.

### Recusal—Private Sessions With Children

The motion to recuse which, as we indicated, has not been included in the record extract, appears to have been based on the January 18 meeting between the judge and the children—the fact that the meeting occurred without notice to appellant and some of the comments made by the judge at the meeting. Although we are disturbed by what occurred, we do not believe that the judge was required to recuse herself.

Md.Rule 910 specifically allows a juvenile court to conduct a hearing in open court or in chambers, and to conduct it "out of the presence of all persons except those whose presence is necessary or desirable." The rule also requires at least five days notice to the parties of any hearing conducted by the court, other than one for continued detention or shelter care.

■ Here, the proceedings were indeed recorded, although not very well. As we indicated, much of the conversation—particularly the children's responses—is either unclear or was not picked up by the recording device. At the July session, it is impossible, from the transcript, even to tell who was talking some of the time. We suggest that, if the court wants to continue to engage in private sessions with children, it will either have to use a more reliable recording system or conduct the session in a different manner, to assure that the entire proceeding is properly and accurately recorded.

■ The court seemed to regard these private meetings as not being hearings, thereby excusing noncompliance with the notice requirement of the rule. That is not the case.

■ For one thing, the DSS social worker was also present at the two sessions and the foster mother was present at one, and they both made comments that were evidentiary in nature, although neither was under oath or subject to cross-examination. The children's statements also were given considerable weight by the court. Due process itself requires that, if the court is going to take evidence in a contested proceeding—including from children in a juvenile proceeding—the parties have notice that it is proposing to do so. Secret proceedings are foreign to our notion of fairness and ordered liberty. Here, the January, 1995 proceeding was not even docketed; it was apparently arranged without notice to anyone in a telephone conversation between the social worker—an interested witness representing an interested party—and the judge's secretary. That needs to stop.

The parties are entitled to notice so they can have the opportunity to object to such proceedings, even if the court is

justified in overruling the objection, and to review what occurred. If no notice is given, how are they to know that there is anything to review? Here, of course, appellant's attorney, by pure happenstance, attended the proceedings, so that aspect of the matter is not a problem in this case.

 Conducting the secret session with the children and the social worker was error because of the lack of notice and proper recording equipment, not because, as appellant asserts, it amounted to an improper *ex parte* proceeding. If a rule of court allows such a proceeding, as Rule 910 does, it is not *per se* improper. The error committed here, however, is not the kind of error that necessarily requires recusal. Rule 3–505, applicable to the District Court, of which the juvenile court in Montgomery County is a part, makes the standard for recusal whether a fair and impartial trial can be had before the judge. Although the judge did make some isolated remarks in her conversation with the children that she should not have made, we see no evidence in the record as a whole that she has compromised her impartiality or has developed any bias against appellant. We therefore find no error in her denial of the motion to recuse.

### Dr. Saiger

 We are also disturbed by the court's refusal to hear further from Dr. Saiger at the review hearing. It is true that he had testified at some length at the disposition hearing, but so had the witnesses for DSS. It is simply impermissible for a court to put a fixed time limit on a proceeding, use nearly all of it to hear evidence from one side, and then refuse to hear from the other side because of a lack of time. Appellant proffered that Dr. Saiger could rebut some of the assertions made by the social workers and inform the court of a lack of cooperation on the part of DSS, which may be undermining efforts at reunification. He should have been permitted to do so; given the issues before the court, that testimony may have been relevant. This error can be corrected on remand. If Dr. Saiger is presented as a witness on remand and has relevant testimony to offer, the court should hear from him.

CASE REMANDED FOR FURTHER PROCEEDING ON ISSUE OF VISITATION; JUDGMENT OTHERWISE AFFIRMED; COSTS TO BE PAID BY APPELLEE.