*In re: G.T.*, No. 1160, September Term 2020.  Opinion by Wells, J.

**CHILD CUSTODY – VISITATION – STANDARD OF REVIEW**

A three-tiered standard of review applies to child custody cases.  Factual findings are examined under the clearly erroneous standard.  If the court erred as a matter of law, further proceedings by the court will be required unless the error is harmless.  Finally, ultimate conclusions based on sound legal principles and factual findings that are not clearly erroneous are subject to an abuse of discretion standard of review.

**CHILD  CUSTODY  –  VISITATION  –  FL  §  9-101  AND  COMAR  07.02.11.05 APPLICABILITY**

FL § 9-101 instructs courts when to award or deny visitation.  Once the court has awarded visitation, FL § 9-101 is inapplicable to situations in which a child subsequently refuses to participate in the ordered visitation.   Instead, COMAR 07.02.11.05 instructs the Department of Social Services to implement a visitation plan that refers the child to a therapist for assistance in resolving the issue rather than forcing the child to participate.

**CHILD CUSTODY – VISITATION – BURDEN OF PERSUASION**

The parent seeking visitation has the burden of persuading the court that the requirements of FL § 9-101 that allow an award of visitation are met.  Here, where the parent made no attempt to argue that the statute's requirements were met, the juvenile court did not err by not awarding unsupervised visitation.

**CHILD CUSTODY – VISITATION – DELEGATION**

Courts may not delegate their authority to determine visitation to the child subject to the order or to a therapist.  However, a court commits no error by taking into account the opinions of the child and therapist—and even placing great weight on such opinions—in making its decision, so long as it does not delegate its authority.

Circuit Court for Baltimore City
Case No. 820253005

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1160

September Term, 2020

_____

IN RE: G.T.

_____

Kehoe,
Arthur,
Wells,

JJ.

_____

Opinion by Wells, J.

_____

Filed: May 26, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On September 10, 2020, the Baltimore City Department of Social Services ("DSS" or "the Department") filed a Shelter Care Petition for the appellant, G.T.[1] The Department alleged that G.T.'s mother, Donna ("Mother"), had neglected, abused, or been unable or unwilling to give G.T. the proper amount of care and attention.

On October 9, 2020, counsel for Mother requested that the court compel G.T. to participate in in-person visitation with her. A family court magistrate recommended that due to the COVID-19 pandemic, she would defer to DSS's policy regarding in-person visitation and recommended that family therapy address the issue. The recommended order, however, was silent as to visitation. On November 24, 2020, Mother filed an emergency motion for in-person visitation. A magistrate denied the request without a hearing on December 1, 2020. Counsel for Mother requested an immediate review of the magistrate's recommendation. After a hearing, the circuit court denied Mother's request for in-person visitation on December 8, 2020. Although a contested adjudicatory hearing was scheduled for and took place on January 6, 2021, Mother, nonetheless, filed this appeal on December 10, 2020.

Before this Court, Mother raises one question, which we have slightly rephrased and separated into two questions for clarity and organizational purposes:[2]

---

[1] To protect the privacy of the appellant, a minor, we refer to her by her initials only. For this same purpose, we refer to her family members by either their first name or a random alphabetical letter only.

[2] Mother's verbatim question reads:

1. Did the juvenile court err in denying visitation to Mother?

1. Did the circuit court's decision to not force G.T. to participate in visitation with Mother violate Maryland Code (1984, 2019 Repl. Vol.), Family Law Article ("FL"), § 9-101?

2. Did the circuit court err by delegating its authority in determining whether visitation to Mother should be awarded?

For the reasons that follow, we hold that the circuit court properly denied Mother's request to force G.T. to participate in visitation with her. We conclude that the court need not have satisfied the FL § 9-101 requirements, as Mother claimed, but the court nonetheless satisfied the statute's factors. Further, the court did not delegate to G.T. or a family therapist the authority to determine whether Mother would be granted visitation or not. Accordingly, we affirm the judgment of the juvenile court.

## FACTUAL BACKGROUND

### A. G.T.'s Familial Relationship and Childhood

G.T. was born to Mother and Father on June 20, 2013. Mother and Father have an older daughter, B.,[3] born on July 22, 2010. B. does not live with either of her parents, but instead lives with a paternal cousin. Neither Mother nor Father have had custody of B. since 2011, two years before G.T. was born. Additionally, Mother has another daughter who was born on August 23, 2004 who also is not in Mother's care. Father and Mother ended their relationship after G.T.'s birth.

---

[3] For the child's privacy, we assign a random alphabetical letter as a pseudonym.

## B. Mother's Past Substance Abuse Problems and Recovery Efforts

B. was born exposed to non-prescribed benzodiazepines, marijuana, and opiates. During her pregnancy with B., Mother tested positive for these drugs on at least nine occasions. Once B. was born, Mother continued to use drugs, as evidenced by a video presented to the Circuit Court for Baltimore County in which Mother can be seen snorting a white powdery substance from a table and Mother passing out with B. in her arms. An agent with the Baltimore County Department of Social Services also described a car accident that Mother caused because she was intoxicated. B. was a passenger. Mother denied that B. was in the car but acknowledged the crash. These events led the circuit court to order B.'s sheltering.

Because of Mother's use of cocaine and abuse of prescription drugs such as Xanax, in February 2019, Mother was referred to drug rehabilitation treatment at the Recovery Network Organization. When G.T. was six years old, Mother left G.T. home alone and overdosed. When it was time to register G.T. for kindergarten, Mother did not register G.T. until two months *after* the start of school. Once G.T. began kindergarten, her school reported that she was absent for an extensive amount of days and that when she did show up to school, she frequently wore the same clothing that had not been washed. Additionally, police received several calls that drug trafficking was occurring in Mother's home.

Mother's treatment at the Recovery Network initially appeared successful. She reached sobriety and was moved to the Marion House. However, after another resident at the Marion House accused Mother of relapsing, she was involved in an altercation with the

resident. Mother left the Marion House with G.T. that same day. The Marion House referred Mother to inpatient treatment at Recovery Network, where she previously went to rehab before coming to the Marion House.

### C. Father's Addiction and Domestic Violence Problems

In addition to Mother, Father has likewise suffered from drug as well as alcohol addiction. Also, Father had exhibited a history of domestic violence. Mother has brought assault charges against Father in 2011 and was granted a protective order from him. In 2017, Father was charged with violating the protective order against Mother. Father is also on probation for assault against his current girlfriend, Angela. He was charged with assault in February of 2020 and his trial was scheduled for October 2020. Additionally, Father has a history of domestic violence against a third woman. Father currently rents a bedroom in a house, to which he has access to the common areas. Father's girlfriend's two children stay with Father and his girlfriend in the bedroom that he rents and sleep on a mattress that is stored in a closet.

### D. Events of September 9, 2020

When Mother left the Marion House, she checked into a room at a Motel 6 with G.T. Around midnight or the early morning of September 9, 2020, Mother left G.T. alone in the motel room. A stranger in an adjoining room and an employee at the motel supervised G.T. to ensure that she did not leave the premises. When Mother had not returned for several hours, someone called the police.

Mother arrived back at the motel around 9:00 a.m. visibly intoxicated. She said that she had gone to a McDonald's restaurant to buy food for G.T. She explained her inebriated

4

state by saying that she had "accidentally" taken two Xanax pills while at McDonald's and fell asleep; she could not remember where she slept. The following day, DSS filed a petition requesting shelter care for G.T.

### E.  Emergency Shelter Hearing

A magistrate with the Circuit Court for Baltimore City held an emergency shelter hearing for G.T. on September 10, 2020.  Mother did not make an appearance at this hearing, which was held virtually amid the COVID-19 pandemic.  Later, Mother reported to the DSS case worker that she had been involved in an automobile accident and was in the hospital, and thus would be unable to make a virtual appearance at the emergency hearing.  However, when the Department contacted the hospital to confirm Mother's account, a hospital employee contradicted Mother, stating that while Mother had been a patient at the hospital, she had not been admitted as the result of a car accident.  The hospital employee did not give the true reason Mother was at the hospital.

At the emergency hearing, DSS and counsel for G.T. argued that G.T. should be sheltered.  Counsel for Father asked that shelter care be denied and that G.T. be placed in his care.  The circuit court "determined that continued residence in the home is contrary to the welfare of [G.T.] and [that] it is not now possible to return [G.T.] to the home because [of] . . . Mother's alleged substance abuse disorder and hospitalization and Father's domestic violence history."  Accordingly, the court granted the Department's request for shelter care and placed G.T. with a friend of Mother.

Although counsel for Mother states that "[o]n September 10, 2020, the [c]ourt . . . denied Mother any visitation with [G.T.,]" our review of the transcript from the shelter

5

hearing does not suggest that Mother was denied visitation at this stage. Indeed, the court's order clearly states that "[the foster parent] shall . . . ensure that [G.T] is appropriately supervised at all times[,] ensure that [G.T.] have no **unsupervised** contact with the parents[, and] not allow [M]other to reside in her home or stay overnight in her home." (emphasis supplied). While this language amounts to a denial of unsupervised visitation, we do not read this language or the court's comments during the hearing to suggest that Mother was denied supervised visitation. Moreover, other than Mother's assertion in her brief that "[o]n September 10, 2020, the [c]ourt . . . denied Mother any visitation with" G.T., Mother cannot identify anywhere in the record where the court denied her all visitation.

### F. Denial of Mother's Request to Force G.T. to Participate in Visitation and Appeal

As noted, although Mother missed the emergency shelter-care hearing and was unrepresented, the court nonetheless awarded her supervised visitation, mandating that the foster parent "ensure that [G.T.] have no unsupervised contact with the parents." Following this, visitation for Mother appears to have been first discussed at an adjudicatory hearing on October 9, 2020. At that time, counsel for Mother noted that Mother was currently receiving in-patient drug treatment at Recovery Network and would soon be finishing COVID-19 quarantining. Mother's counsel requested that Mother be allowed in-person visitation with G.T. After counsel for DSS and counsel for G.T. reported that G.T. was unwilling to participate in either telephonic or in-person visits with Mother, they requested that no in-person visitation be scheduled at that time. Counsel for Mother then

6

asked the court to order family reunification therapy; counsel for G.T. asked that only individual therapy for G.T. be ordered.

The magistrate presiding at the adjudicatory hearing remarked that "first of all, the therapist is going to have to assess the situation and probably start with the individual" so that they can "let somebody get to know G[.T.] first and see where we are and what kind of help we can offer her. Then we'll have kind of a better idea of how to proceed." When counsel for Mother sought clarification on whether this meant that her request for in-person visitation would be granted, the Magistrate responded:

> Well, I guess we better now involve the therapist in helping us with that. You know, the therapist is going to need to kind of pursue the situation and see where we are, and then see what may work. So I don't want to try to preempt what may go on with the therapy.
>
> So, I'm going to say, if it develops into a problem, you can always file something and I'll get you back on the calendar.

On November 24, 2020, Mother filed an emergency motion for in-person parenting time, requesting that the magistrate "[o]rder supervised in-person parental visitation between Mother and [G.T.]" or "[a]lternatively, order supervised telephonic or remote parental visitation between Mother and [G.T.]" The magistrate recommended on December 1, 2020 that Mother's motion be denied. On December 2, 2020, counsel for Mother requested immediate review of the decision, which was argued before a circuit court judge on December 8, 2020. It is this hearing and order that concerns our review.

At the December 8, 2020 hearing, counsel for Mother argued that (1) despite the fact that G.T. does not want to visit with Mother, G.T. is too young to make such a determination, (2) the court should not entirely rely on the therapist's assumed

7

recommendation, and (3) that Mother has been taking positive steps to address her drug abuse problem. DSS responded that (1) G.T. has refused visitation, (2) that under Code of Maryland Regulation ("COMAR") 07.02.11.05(C)(7)(c), the Department may not force children to participate in visitation but instead refers the matter to a therapist, and (3) that the therapist has not recommended visitation.

Counsel for G.T. also requested that G.T. not be forced to participate in visitation, reiterating the Department's arguments, but also arguing that a grant of visitation would be inappropriate under FL § 9-101(b). Counsel for G.T. contended that under that statute, no visitation should be granted unless the court finds that there is "no likelihood of further child abuse or neglect . . . [e]xcept that the [c]ourt may approve a supervised visitation arrangement that ensures the safety and physiological, psychological, and emotional well[-]being of the child." Because the court did not make findings with respect to future abuse or neglect, counsel for G.T. reasoned, the court could not award unsupervised visitation and, further, any award of supervised visitation would harm G.T.'s well-being. For these reasons, counsel for G.T. argued, "visitation is not in the best interest of G[.T.]"

In response to the above arguments, the court orally ruled that the magistrate's recommendation that G.T. not be forced to visit with Mother was reasonable:

> [E]verything that the Court has heard today[ illustrates] basically that [G.T.] does not wish to see or talk to Mother at this time. Although the Department has attempted to coordinate visitation, [G.T.] is not willing or refuses to participate in visitation at this time. Now, I think there[ are] two parts, two different things.
>
> If this were a case where the child has not stated a position about visitation and the Department was not doing its part, as in trying to coordinate or facilitate visitation, then, [counsel for Mother], the Court believes that you

8

would have, for lack of a better word, a valid gripe. Because then it would be the Department failing to perform the duties as required. But in this case, it is [G.T.] who refuses to have visitation or participate in visitation with Mother.

\* \* \*

Counsel stated that [G.T.] had just begun individual therapy to address her mental health needs and visitation would be inappropriate and not serve [G.T.'s] best interest. While both counsel for [G.T.] and the Department have stated that [G.T.] does not want to see or have visits with Mother, the Court does find that if the therapist believes that it[']s inappropriate, that the Court should not force the Respondent to participate in visitation.

Further, pursuant to COMAR Regulation 7.02.11.05, the Department cannot force a child to participate in said visitation. Therefore[,] the ruling of the Magistrate shall stand. I mean, the Court would note that in prior orders it does [address] visitation with Mother . . . Additionally, since there has not been any [FL §] 9-101 findings regarding abuse and neglect, the Court is not inclined to do so at this juncture or can[]not. But primarily the Court is upholding the ruling of Magistrate Brown because the child does not wish to see Mother at this time.

But we can remain hopeful that therapy can address these issues and hopefully they can move toward visitation and reunification.

Two days after this ruling, counsel for Mother appealed to this Court.

## DISCUSSION

### I. THE CIRCUIT COURT WAS NOT REQUIRED TO BUT NONETHELESS SATISFIED FL § 9-101

The first issue is whether the circuit court was required to satisfy FL § 9-101 when it denied Mother's emergency motion for in-person visitation. We hold that given the facts of this case, the court was not required to satisfy FL § 9-101. Regardless, we hold that FL § 9-101's requirements were satisfied and find no error.

9

## A. The Parties' Contentions

In her brief, Mother begins her argument by citing FL § 9-101 and argues that "[c]ourts are only *(sic)* required by statute to deny custody or unsupervised visitation unless the court makes a specific finding that there is no likelihood of further child abuse or neglect. . . . Thus, courts have a higher degree of responsibility only where abuse is proven." Mother continues by arguing that the statute, although comprised of restrictive language, "still allows for the court to fashion a visitation arrangement for, presumably, any parent." Pointing out that FL § 9-101 requires denial of visitation only if a likelihood of future abuse or neglect is found by the court, Mother contends that the court here "made no such finding that [Mother] would perpetrate abuse or neglect on her child" and that "there is no evidence for the Court to assume that future abuse or neglect was likely."

The Department responds by explaining that when a Maryland court "has reasonable grounds to believe that a parent has neglected a child, it is *required* to deny visitation to that parent unless there is 'no likelihood of further neglect' but '*may* approve a supervised visitation arrangement that assures the safety and the *physiological, psychological and emotional well-being* of the child." (emphasis supplied by DSS). DSS argues that there was no abuse of discretion here because Mother entirely failed to meet her burden in persuading the court that there was no likelihood of future abuse or neglect.

Counsel for G.T. argues that FL § 9-101 is entirely inapplicable here. G.T.'s counsel reasons that because the court found on September 10, 2020 that contact between G.T. and her parents was to be supervised, and because the absence of visitation arises solely from G.T.'s refusal to engage in visitation with Mother, the court never denied visitation but

10

instead denied Mother's request to force G.T. to participate in visitation. Instead, G.T.'s counsel reasons that the proper inquiry is a determination of whether it is in G.T.'s best interests to force her to participate in visitation. Counsel for G.T. argues that it is not in G.T.'s best interest to be compelled to participate in visitation with Mother.

### B. Applicability of FL § 9-101

We first address whether FL § 9-101 must be satisfied. FL § 9-101 reads:

> (a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

> (b) Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

The statute directs Maryland judges on when it is appropriate for them to order visitation. Put another way, "when a court has reasonable grounds to believe that neglect or abuse has occurred . . . custody or visitation must be denied, except for supervised visitation, unless the court makes a specific finding that there is no likelihood of further abuse or neglect." *In re Billy W.*, 387 Md. 405, 447-48 (2005) (citing *In re Yve S.*, 373 Md. 551, 566-67 (2003)). Moreover, "[i]f the court determines, as an exception, that supervised visitation is appropriate, the court must assure, at a minimum, that such visitation will not jeopardize the safety and well-being of the child." *Id.* at 448. "Unless the court specifically finds that there is no likelihood of further abuse or neglect by that party, it must deny custody or visitation rights to that party except for a supervised visitation arrangement that assures the

11

safety and the physiological, psychological, and emotional well-being of the child." *In re Adoption No. 12612 in Cir. Ct. for Montgomery Cty.*, 353 Md. 209, 234 (1999).

At issue here, however, is not a straightforward denial of Mother's visitation rights, as she contends. As noted, our review of the record shows that Mother was never outright denied visitation. Indeed, on September 10, 2020, even after Mother missed the emergency shelter-care hearing and was unrepresented by counsel, the court still ordered that G.T.'s temporary caretaker "ensure that she and [G.T.] are available for both in-person and virtual visits with []DSS and child's counsel announced and unannounced . . . [and] ensure that [G.T.] have no **unsupervised** contact with the parents." (emphasis added). The order continued that the caretaker also "not allow [M]other to reside in her home or stay overnight in her home[.]" Ensuring that there is no unsupervised contact between G.T. and Mother, as well as ensuring that Mother does not reside or spend the night in the G.T.'s caretaker's home cannot be interpreted as a blanket denial of visitation for Mother.

But it is undisputed that G.T. refused to visit with Mother. Only then did Mother file an emergency motion for in-person visitation. After the family magistrate denied the emergency motion without a hearing, Mother filed exceptions to the magistrate's recommendation. At the subsequent hearing, counsel for Mother began not by contending that the court had denied Mother visitation, but instead by arguing that the Department had not properly facilitated the supervised visitation that the court had previously ordered:

> Mother is here seeking supervised in-person parenting time . . . The [c]ourt recognized that []DSS, having an order of shelter care for [G.T.], is expected to provide reasonable supervised visitation or parenting time with [G.T.] since September 10th, 2020.

12

Mother is not aware of any efforts that the department plan is making toward remedying [G.T.'s] unwillingness to see or communicate with Mother through therapy.

Despite Mother's and the Department's assumption that FL § 9-101 applies, the statute states that "**the court** shall deny custody or visitation rights to th[e] party" that is seeking it and does not concern situations where supervised visitation was ordered but where the child refused to participate (emphasis added). In their briefs, neither Mother nor the Department argue why FL § 9-101 would apply to this type of a situation. Mother did not file a reply brief that would explain her position, and because the parties submitted on the briefs, no explanation could be provided at oral argument.

After our review of the statute, relevant case law, and counsel for G.T.'s argument on the point, we are persuaded that FL § 9-101 concerns whether "the court shall deny custody or visitation rights" and does not concern situations in which visitation has been ordered but the child resists visitation. *See* FL § 9-101; *In re Billy W.* 387 Md. at 447-48; *In re Adoption No. 12612 in Cir. Ct. for Montgomery Cty.*, 353 Md. at 234. Other than Mother's assumption and the Department's implicit assumption that the statute applies, we have been unable to find anything that suggests that FL § 9-101 should extend to this kind of situation. Therefore, we agree with G.T.'s counsel that "the [c]ourt has never denied visitation to the parents. The Court has denied only Mother's request to force G.T. to participate in visitation with her."

In its order, the circuit court did not mention FL § 9-101 but instead relied, in part, on COMAR 07.02.11.05(C)(7)(c): "pursuant to COMAR Regulation 07.02.11.05, the Department cannot force a child to participate in said visitation. Therefore[,] the ruling of

13

the Magistrate shall stand." We find no error in the court's reliance on this regulation rather than on FL § 9-101 because the regulation provides, in relevant part, that DSS shall "[i]mplement a visitation plan which . . . [d]oes not force a child to participate in visitation but refers the child to a therapist for assistance in resolving the visitation issues[.]" COMAR 07.02.11.05(C)(7)(c). It seems to us that COMAR 07.02.11.05(C)(7)(c) is perfectly applicable to situations such as this in which visitation had been granted but the child balks at participating in visits with a parent. Accordingly, we must reject Mother's assertion that the court erred for "incorrectly rel[ying] upon the Code of Maryland Regulation" instead of applying FL § 9-101 because, here, the court was not faced with denying visitation but instead an issue regarding G.T.'s willingness to participate in supervised visitation.

### C. Application of FL § 9-101

Even if we were to hold that FL § 9-101 applied to this case, we would still not find error. FL § 9-101 mandates that in order for the court to award unsupervised visitation, the court must make a specific finding that there is no likelihood of future abuse or neglect. Similarly, in order for the court to award supervised visitation under FL § 9-101, the court is required to make a specific finding that the arrangement would assure the child's safety as well as physiological, psychological, and emotional well-being.

In her brief, Mother oversimplifies FL § 9-101 by asserting that "[t]he language of the statute, as restrictive as it is, still allows for the court to fashion a visitation arrangement for, presumably, any parent. The statute requires denial or restriction of visitation only if the court specifically finds that there is a 'likelihood' of further abuse or neglect." While

14

this may be true, Mother ignores that the burden of persuasion is on her as the parent seeking visitation. Indeed, our case law illustrates that it is the parent's burden "to adduce evidence and persuade the court to make the requisite finding under [FL] § 9-101(b)." *In re Yve S.*, 373 Md. at 587.

We are convinced, from our review of the record, that Mother has not met the burden of persuasion. As discussed in the previous section, supervised visitation for Mother was ordered by the circuit court. When arguing to the circuit court at the December 8, 2020 hearing, Mother's counsel made no reference whatsoever to FL § 9-101. **[T. 12/08/2020, 5:7-9:7].** Mother likewise made no arguments about FL § 9-101's requirements (1) for unsupervised visitation—in that there would be no likelihood of future abuse or neglect for G.T.—or (2) for supervised visitation—in that G.T.'s physiological, psychological, and emotional well-being would not be harmed. Even after G.T.'s counsel brought up the statute, specifically stating its requirements and arguing how those requirements were not met, counsel for Mother still failed to even acknowledge the statute or its requirements during its rebuttal to the circuit court. Given that Mother clearly did not meet her burden of persuasion by entirely failing to bring up the statute and its requirements, we cannot find that the court erred under FL § 9-101 by not awarding unsupervised visitation or by not requiring G.T. to participate in the already-ordered supervised visitation.

## II. THE CIRCUIT COURT DID NOT DELEGATE ITS DECISION OF WHETHER MOTHER SHOULD BE AWARDED VISITATION

The second issue concerns whether the circuit court erred in allegedly delegating its authority to decide whether Mother should be awarded visitation to G.T.  Because we hold that no such delegation occurred, we find no error.

**A. The Parties' Contentions**

Mother's subsidiary argument is, *first*, that the court improperly delegated its authority to decide whether visitation will occur to G.T.:

> The Department, however, argued that it had made attempts to facilitate visitation between [M]other and [G.T.] and that [G.T.] had refused to participate . . . In support of the Department's position, it relied on Code of Maryland regulations *(sic)* 7.02.11.05(c)(7) in that the Department does not force a child to participate in visitation but refers the child to a therapist in resolving visitation issues.

> The Court had *(sic)* already addressed this issue that it is not within the control of a young child to make the determination if and when visitation should occur.

Apparently, Mother relies on our decision in *In re Iris M.*; she quotes from that case but, inexplicably, does not cite it.  There, we held that while the wishes of a child who has reached the age of discretion should be given consideration, the child's wishes should not be controlling.  118 Md. App. 636, 648 (1998).  Arguing that the court relied solely on G.T.'s wishes, Mother urges us to hold that to do so was error.

*Second*, Mother argues that the court delegated its authority to G.T.'s therapist to determine whether visitation will go forward:

> The [c]ourt, in [i]ts ruling, delegated [i]ts responsibility to address visitation between the respondent and her mother to a therapist which is in clear contravention of case law[,] which finds that such a delegation of duty is impermissible. *See Shapiro v. Shapiro*, 54 Md. App. 477 (1983).

16

That Court held that the delegation of visitation to a therapist to determine when visits should occur was "an improper delegation of judicial responsibility and was therefore improper."

The Department and counsel for G.T. agree that a delegation to G.T. or to her therapist would be improper, but they contend that no such delegation occurred. With respect to an alleged delegation to G.T., DSS and G.T.'s counsel contend that the court appropriately considered G.T.'s wishes as one, not the sole, factor in making its determination. Likewise, the Department and G.T.'s counsel contend that although the circuit court said that it would take the therapist's recommendations into account, the court did not give the therapist wholesale authority to determine if, when, and how visitation will occur. They argue that this case is distinct from *Shapiro*, on which Mother relies. *See* 54 Md. App. at 477.

**B. Standard of Review**

Generally, decisions concerning visitation are "within the sound discretion of the trial court," and we accordingly will not disturb such decisions "unless there has been a clear abuse of discretion." *In re Billy W.*, 387 Md. at 447. Nonetheless, our Court applies "a three-tiered, interrelated standard of review" when reviewing child custody determinations. *In re Adoption of K'Amora K.*, 218 Md. App. 287, 301 (2014). As the Court of Appeals aptly explained in child custody cases:

> [First, w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard . . . applies. [Secondly, i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are

not clearly erroneous, the [court]'s decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.* 373 Md. at 586 (quoting *Davis v. Davis*, 280 Md. 119, 125-26 (1977)). Accordingly, our Court reviews "the circuit court's factual findings for clear error and its ultimate decision to terminate Mother's parental rights for abuse of discretion." *In re Adoption of K'Amora K.*, 218 Md. App. at 301.

### C. Delegation to G.T. Analysis

At the outset, our understanding is that, on the one hand, Mother argues that the court wholly delegated its authority to G.T. to determine whether visitation would occur, but simultaneously, Mother argues that the court delegated the same decision-making authority to G.T.'s therapist. We cannot see how these two arguments could concurrently be true. Nonetheless we separately analyze each of Mother's arguments, beginning with whether the court delegated its decision-making power to G.T.

Although the court ordered supervised visitation in its September 10, 2020 order, G.T., seven years-old at the time, was unwilling to participate in visitation with Mother. During telephone calls that DSS facilitated, G.T. repeatedly told Mother that she did not want to see her. G.T. communicated this same desire to the DSS workers. G.T. explained that she was tired of seeing her mother "pop pills," and refused to see her.

When making its findings at the conclusion of the hearing, the court noted that G.T. did "not wish to see or talk to Mother at this time" and that she was "not willing or refuses to participate in visitation at this time." The court continued to differentiate situations like this with situations in which "the child has not stated a position about visitation" before

18

stating that it was "primarily" upholding the magistrate's decision to deny Mother relief "because [G.T.] does not wish to see Mother at this time."

Mother, DSS, and counsel for G.T. all agree that the determination of whether to implement visitation is for the court to decide, not G.T. Our case law proves this point, as we have held that "[i]t cannot be left up to the unfettered discretion of . . . five-year old children whether to visit with their mother, especially when the visits are carefully supervised." *In re Barry E.*, 107 Md. App. 206, 220 (1995). All parties also agree that even so, Maryland courts may look at the wishes of the child as a factor in making the determination of whether visitation should be granted. As Mother put it, "in this instant *(sic)* case, where the respondent is 7 years old, the wishes of the respondent should be used to guide the Court in [i]ts decision but should not be the determining factor[.]" And, significantly, we have also established that children should not be "physically forced, kicking and screaming, into their mother's presence." *Id.* at 221.

The parties' only disagreement is whether the court completely delegated the decision to G.T., giving her the "unfettered discretion" that *In re Barry E.* does not allow, or whether the court simply used G.T.'s wish as a factor. *See* 107 Md. App. at 220. Our review of the judge's oral findings and her later written order makes it clear that the court used G.T.'s wishes as a factor and that it did not delegate its authority to G.T. To be sure, the court gave G.T.'s wishes great weight, calling it a "primary factor" and contrasting it with a situation where a child had not stated a position on visitation. But G.T.'s wishes were not the only factors that the court considered. For instance, the court stated its reliance on COMAR 07.02.11.05(C)(7)(c) both in its oral findings and in its written order. And

19

again, the court noted the therapist's recommendation as another factor. Given the court's reliance on "sound legal principles and base[s] upon factual findings that are not clearly erroneous," we perceive no legal error and decline to disturb the court's ruling. *See In re Yve S.*, 373 Md. at 586 (quoting *Davis*, 280 Md. at 125-26).

### D. Delegation to Therapist Analysis

Finally, we answer whether the court delegated its authority to determine visitation to G.T.'s therapist. On this point, the court stated in its findings that "if the therapist believes that its inappropriate, that the [c]ourt should not force [G.T.] to participate in visitation" it would consider that recommendation. The court also said that "we … remain hopeful that therapy can address these issues and … they can move toward visitation and reunification."

Once again, all parties agree that the therapist's opinion may be appropriately used as a guide but may not be the sole factor for the court to rely upon. Broadly, "[t]here is no authority for the delegation of any portion of [a court's] jurisdiction to someone outside the court." *Shapiro*, 54 Md. App. at 484. And specific to the visitation context, we have held "that a denial of visitation until such visitation is recommended by the child's physician and then only upon such terms, guidelines[,] and at such places as the physician may recommend constitutes an improper delegation of judicial responsibility[.]" *Id.* (citing *In re Marriage of Matthews*, 101 Cal.App.3d 811 (Cal. 1980)). Once again, the parties' only contention is whether delegation actually occurred, not whether delegation is legally allowed.

20

This case stands in sharp contrast with *Shapiro*, the only case on which Mother relies. In *Shapiro*, we held a judge's statement that "I am going to grant visitation to [the father], conditioned, however, on the recommendation of [the therapist], who will notify [the parties] when this visitation can be brought about" to be an improper delegation of authority. *Shapiro*, 54 Md. App. at 483. Here, no such condition was given. Although Mother does not argue it, we point out that the court's finding is distinguishable from our precedent in *In re Mark M.*, 365 Md. 687, 707 (2001). In that case, the circuit court judge flatly stated that "[v]isitation will not occur until [the child's] therapist recommends it." That comment is far different from this situation where the court expresses hope that therapy will help Mother and G.T. bridge any disagreements they might have and encourage visitation to occur. *See id.*

Unlike *Shapiro*, here, the court made clear that the therapist's opinions were factors—not the sole or even the primary factor—in making its determination. Indeed, we point out that in the above-cited cases, COMAR 07.02.11.05(C)(7)(c) and its language provide that DSS must "[i]mplement a visitation plan which . . . [d]oes not force a child to participate in visitation but **refers the child to a therapist for assistance** in resolving the visitation issues." COMAR 07.02.11.05(C)(7)(c) (emphasis added). In *Shapiro* and *In re Mark M.*, COMAR was not at play because those cases did not deal with the situation before us in which supervised visitation had been granted but the child refused to participate. The court's order noted that its ruling was "pursuant to COMAR Regulation 7.02.11.05," and we believe any reliance of the court on the therapist's opinion

21

appropriately stemmed from that regulation and not FL § 9-101. *See In re Mark M.*, 365 Md. at 687 (where the context was FL § 9-101).

In sum, the court's language here is distinct from the juvenile court's language in *Shapiro* and *In re Mark M.* in that it does completely—or even primarily—rely on the therapist's opinion. Also, we believe any reliance on the therapist's opinion was in the appropriate context of COMAR 07.02.11.05(C)(7)(c). We perceive no error and decline to disturb the court's ruling. *See In re Yve S.*, 373 Md. at 586 (quoting *Davis*, 280 Md. at 125-26).

> **THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. APPELLANT TO PAY COSTS.**